RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0172P (6th Cir.)
File Name: 02a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

WESTSIDE MOTHERS, a
Michigan Welfare Rights
Organization; MICHIGAN
LEAGUE FOR HUMAN
SERVICES, INC.; FAMILIES ON
THE MOVE, INC.; AMERICAN
ACADEMY OF PEDIATRICS;
AMERICAN ACADEMY OF
PEDIATRIC DENTISTS; B.K., by
her next friend LOIS ANN K.;
D.J., by her next friend
TANGELA W.; DN.J., by her
next friend TANGELA W.;
DM.J., by his next friend
TANGELA W.; K.K., by her
next friend VICKI K.; K.T., by
her next friend VEDA T.; J.T.,
by his next friend VEDA T.,
      *Plaintiffs-Appellants,*

        *v.*

JAMES K. HAVEMAN, JR.,
Director of the State of
Michigan Department of
Community Health; ROBERT

No. 01-1494

SMEDES, Deputy Director of
the Medical Services
Administration,
          *Defendants-Appellees,*

UNITED STATES OF AMERICA,
                *Intervenor.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-73442—Robert H. Cleland, District Judge.

Argued: January 24, 2002

Decided and Filed: May 15, 2002

Before: MERRITT, BOGGS, and MOORE, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Jennifer R. Clarke, DECHERT, PRICE &
RHOADS, Philadelphia, Pennsylvania, Thomas K. Gilhool,
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA,
Philadelphia, Pennsylvania, for Appellants. Erica Weiss
Marsden, OFFICE OF THE ATTORNEY GENERAL,
Lansing, Michigan, for Appellees. Alisa B. Klein, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Intervenor. **ON BRIEF:** Jennifer R. Clarke, Kelly L.
Darr, Robin P. Sumner, Jacob I. Kobrick, DECHERT, PRICE
& RHOADS, Philadelphia, Pennsylvania, Thomas K. Gilhool,
PUBLIC INTEREST LAW CENTER OF PHILADELPHIA,
Philadelphia, Pennsylvania, Marilyn T. Mullane, MICHIGAN
LEGAL SERVICES, Detroit, Michigan, Lourdes A. Rivera,
NATIONAL HEALTH LAW PROGRAM, INC., Los

requirements for associational standing. Therefore, we
reverse the district court's dismissal of the Michigan chapters
of the American Academy of Pediatrics and of the American
Academy of Pediatric Dentists as plaintiffs.

*2. Defendant's request for summary judgment*.--Michigan
also asks us to affirm the dismissal of the suit even if we
disagree with the district court's reasons for dismissing it.
*See* Appellees' Br. at 31. It gives numerous grounds apart
from those relied on in the district court opinion, claiming
*inter alia* that (1) the individual plaintiffs lack standing,
(2) the state does provide the screening and treatment
services, and (3) the plaintiffs fail to state a claim against
Michigan, because plaintiffs allege only that a state contractor
failed to provide a service. In support of its requests
Michigan provides records, printed materials, flyers, and
manuals that, it asserts, support its claims. The defenses raise
factual and legal issues not addressed by the district court.
We are advised that discovery in this case has been stayed
since at least October 26, 1999, some two years ago, and less
than three months after the original complaint was filed. We
decline to rule on the issues before the district court has made
a factual record.

### *Conclusion*

Accordingly we REVERSE the district court's grant of
summary judgment to defendants, AFFIRM in part and
REVERSE in part the district court's dismissal of
organizational plaintiffs for lack of standing, and REMAND
the case for further proceedings consistent with this opinion.

F.3d 272, 294 (6th Cir. 1997) (citing *Hunt v. Washington Apple Adv't Comm'n*, 432 U.S. 333 (1977)).

The district court held that the Welfare Rights Organization lacked constitutional standing because plaintiffs' complaint contained little information about the organization, leaving the district court unable to determine whether it met the requirements set out above. Plaintiffs' appeal asks us to reverse this holding but provides no facts that would lead us to second-guess the district court's decision. Therefore, we affirm the dismissal of the Michigan Welfare Rights Organization as a plaintiff.

The district court held that the two professional organizations lacked standing because their members could not sue in their own right, since they are not the intended beneficiaries of the Medicare provision in question, 42 U.S.C. § 1396a(a)(30)(A). *See* J.A. at 278-79. Plaintiffs counter that some provisions of the Medicaid act do have medical providers as intended beneficiaries. *See, e.g.*, *Wilder*, 496 U.S. at 509. In *Wilder*, the Supreme Court found that medical providers were intended beneficiaries of the Boren Amendment to the Medicare Act because that "provision establish[ed] a system for reimbursement of providers and is phrased in terms benefitting health care providers." *Id*. Looking to the Medicare provision here, we find similar language. The statute speaks of the need to "assure that payments . . . are sufficient to enlist enough providers." 42 U.S.C. § 1396a(a)(30)(A). The two organizations claim that the defendants have imposed on them "otherwise unnecessary expenditures," meaning that the organizations' members have suffered an injury by not receiving compensation for medical services their members are ethically compelled to provide. *See* J.A. at 24-25. Their members have (1) alleged an injury-in-fact, limitation of Medicare services that resulted in reduced payments, (2) shown this injury is traceable to defendants' actions, and (3) shown the injury could be redressed through a favorable decision, *see Cleveland Surgi-Center*, 2 F.3d at 688; and the organizations meet the

Angeles, California, Susan K. McParland, MICHIGAN ASSOCIATION FOR CHILDREN, Southfield, Michigan, Martha Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Chapel Hill, North Carolina, for Appellants. Erica Weiss Marsden, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. Alisa B. Klein, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor. David T. Goldberg, DAVID T. GOLDBERG LAW OFFICE, New York, New York, Drew S. Days III, MORRISON & FOERSTER, Washington, D.C., Erwin Chemerinsky, Los Angeles, California, Fordham E. Huffman, Chad A. Readler, JONES, DAY, REAVIS & POGUE, Columbus, Ohio, James L. Feldesman, FELDESMAN, TUCKER, LEIFER, FIDELL & BANK LLP, Washington, D.C., Larry S. Gage, Barbara D.A. Eyman, Charles Luband, Aimee N. Wall, POWELL, GOLDSTEIN, FRAZER & MURPHY, Washington, D.C., Phyllis James, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, Richard Clayton Trotter, TEXAS JUSTICE FOUNDATION, San Antonio, Texas, Patrick W. Beatty, Rebecca L. Thomas, Robert C. Maier, Darrell M. Pierre, Jr., OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, Timothy P. Heather, BENJAMIN, YOCUM & HEATHER, Cincinnati, Ohio, for Amici Curiae.

---

## OPINION

---

MERRITT, Circuit Judge. This suit filed under 42 U.S.C. § 1983 alleges that the state of Michigan has failed to provide services required by the Medicaid program. Plaintiffs, Westside Mothers, other advocacy and professional organizations, and eight named individuals allege that defendants James Haveman, director of the Michigan Department of Community Health, and Robert Smedes, deputy director of the Michigan Medical Services Administration, did not provide the early and periodic

screening, diagnosis, and treatment services mandated by the Medicaid Act and related laws.

The Medicaid program, created in 1965 when Congress added Title XIX to the Social Security Act, provides a federal subsidy to states that choose to reimburse poor individuals for certain medical care. *See* 42 U.S.C § 1396 *et seq.* (1994 & Supp. 2001) ("Medicaid Act"); *Harris v. McRae*, 448 U.S. 297, 301 (1980). "Although participation in the program is voluntary, participating states must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services." *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 502 (1990). Like all other states, Michigan participates in the Medicaid program. Since 1997, operating under a waiver from the Health Care Finance Administration, Michigan has provided eligible residents Medicaid services by requiring them to enroll in Health Maintenance Organizations, which provide medical care in exchange for a flat monthly fee per participant. J.A. at 165-71.

The Medicaid Act and related regulations set out a detailed list of services every state program must provide. *See* 42 U.S.C. § 1396 *et seq.*; 41 C.F.R. §§ 430 *et seq.* (2000). The Act allows the Secretary of Health and Human Services to limit or end payments to a state whose Medicaid program does not provide these services. *See* 42 U.S.C. § 1396c.

At issue here is the federal requirement that participating states provide "early and periodic screening, diagnostic, and treatment services . . . for individuals who are eligible under the plan and are under the age of 21." *Id*. § 1396d(a)(4)(B); *see also id*. § 1396d(r) (defining such services); 41 C.F.R. §§ 441.55-.62 (same). The required services include periodic physical examinations, immunizations, laboratory tests, health education, *see* 42 U.S.C. § 1396d(r)(1), eye examinations, eyeglasses, *see id*. § 1396d(r)(2), teeth maintenance, *see id*. § 1396d(r)(3), diagnosis and treatment of hearing disorders, and hearing aids, *see id*. § 1396d(r)(4).

the screening and treatment provisions "*must* be provided," *id*. §1396a(a)(10)(A), *see also* 42 C.F.R. § 441.56 (mandatory language). Third, the provisions are not so vague and amorphous as to defeat judicial enforcement, as the statute and regulations carefully detail the specific services to be provided. *See* 42 U.S.C. § 1396d(r). Finally, Congress did not explicitly foreclose recourse to § 1983 in this instance, nor has it established any remedial scheme sufficiently comprehensive to supplant § 1983. *See Blessing*, 520 U.S. at 346-47.

Plaintiffs have a cause of action under § 1983 for alleged noncompliance with the screening and treatment provisions of the Medicaid Act.

### D. Other Issues

*1. Standing.*--In a separate opinion, the district court dismissed as plaintiffs two advocacy organizations, the Michigan League for Human Services and the Michigan Welfare Rights Organization, and two professional organizations, the Michigan chapters of the American Academy of Pediatrics and of the American Academy of Pediatric Dentists. J.A. at 265-81. The Michigan League for Human Services does not appeal the district court's ruling. We address the appeals of the other three organizations.

To have standing a litigant must show (1) some actual or threatened injury, (2) fairly traceable to the defendant's challenged action, which (3) can likely be redressed by a favorable decision. *See Cleveland Surgi-Center, Inc. v. Jones*, 2 F.3d 686, 688 (6th Cir. 1993). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Natl. Rifle Ass'n v. Magaw*, 132

511-12 (holding that the Boren Amendment to the Medicaid Act created a right enforceable under § 1983); *Audette v. Sullivan*, 19 F.3d 254, 256 (6th Cir. 1994) (applying the test set out in *Wilder* to determine if a particular Medicaid provision creates a right enforceable under § 1983).

In *Blessing*, the Supreme Court set down the framework for evaluating a claim that a statute creates a right privately enforceable against state officers through § 1983. *See* 520 U.S. at 340-41. A statute will be found to create an enforceable right if, after a particularized inquiry, the court concludes (1) the statutory section was intended to benefit the putative plaintiff, (2) it sets a binding obligation on a government unit, rather than merely expressing a congressional preference, and (3) the interests the plaintiff asserts are not so "'vague and amorphous' that [their] enforcement would strain judicial competence." *Id*. at 341 (quoting *Wright v. Roanoke Redevel. and Housing Auth.*, 479 U.S. 418, 437 (1987)). If these conditions are met, we presume the statute creates an enforceable right unless Congress has explicitly or implicitly foreclosed this. *See Blessing*, 520 U.S. at 341; *Wood v. Tompkins*, 33 F.3d 660, 666 (6th Cir. 1994). The district court erred when it did not apply this test to evaluate plaintiffs' claims.

We now apply this test. First, the provisions were clearly intended to benefit the putative plaintiffs, children who are eligible for the screening and treatment services. *See* 42 U.S.C. § 1396a(a)(10)(A). "[I]t is well-settled that Medicaid-eligible children under the age of twenty-one . . . are the intended beneficiaries of the [screening and treatment] provisions." *Dajour B. v. City of New York*, 2001 WL 830674, at *8 (S.D.N.Y. July 23, 2001); *accord Miller v. Whitburn*, 10 F.3d 1315, 1319 (7th Cir. 1993). We have found no federal appellate cases to the contrary. Second, the provisions set a binding obligation on Michigan. They are couched in mandatory rather than precatory language, stating that Medicaid services "*shall* be furnished" to eligible children, 42 U.S.C. § 1396a(a)(8) (emphasis added), and that

In 1999, plaintiffs sued the named defendants under § 1983, which creates a cause of action against any person who under color of state law deprives an individual of "any right, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. They alleged that the defendants had refused or failed to implement the Medicaid Act, its enabling regulations and its policy requirements, by (1) refusing to provide, and not requiring participating HMOs to provide, the comprehensive examinations required by §§ 1396a(a)(43) and 1396d(r)(1) and 42 C.F.R. § 441.57; (2) not requiring participating HMOs to provide the necessary health care, diagnostic services, and treatment required by § 1396d(r)(5); (3) not effectively informing plaintiffs of the existence of the screening and treatment services, as required by § 1396a(a)(43); (4) failing to provide plaintiffs the transportation and scheduling help needed to take advantage of the screening and treatment services, as required by § 1396a(a)(43)(B) and 42 C.F.R. § 441.62; and (5) developing a Medicaid program which lacks the capacity to deliver to eligible children the care required by §§ 1396(a)(8), 1396a(a)(30)(A), and 1396u-2(b)(5). J.A. 38-46.

Defendants moved to dismiss the plaintiffs and for dismissal of the suit. In 1999, the district court granted defendants' motion to dismiss as plaintiffs four organizations.[1] It dismissed the Michigan League for Human Services and the Michigan Welfare Rights Organization on the grounds that they lacked constitutional standing, and it dismissed the Michigan chapters of the American Academy of Pediatrics and of the American Academy of Pediatric Dentists on the grounds that they lacked prudential standing.

---

[1]In December 1999 the district court also disposed of part of plaintiffs's fourth claim, that Michigan had not provided required transportation assistance, on grounds of *res judicata* and collateral estoppel, finding those issues were addressed in *Boatman v. Hammons*, 164 F.3d 286 (6th Cir. 1998). That ruling is not appealed here.

It allowed the remaining organizations and individuals to continue as plaintiffs.

In March 2001 the district court granted defendants' motion to dismiss all remaining claims. *See Westside Mothers v. Haveman*, 133 F.Supp.2d 549, 553 (E.D. Mich. 2001). In a detailed and far-reaching opinion, the district court held that Medicaid was only a contract between a state and the federal government, that spending-power programs such as Medicaid were not supreme law of the land, that the court lacked jurisdiction over the case because Michigan was the "real defendant and therefore possess[ed] sovereign immunity against suit," *id*., that in this case *Ex parte Young* was unavailable to circumvent the state's sovereign immunity, and that even if it were available § 1983 does not create a cause of action available to plaintiffs to enforce the provisions in question.

This appeal followed. We reverse on all issues presented.

### *Analysis*

#### A.  *Medicaid Contracts and the Spending Power*

Much of the district court's decision rests on its initial determinations that the Medicaid program is only a contract between the state and federal government and that laws passed by Congress pursuant to its power under the Spending Clause are not "supreme law of the land." We address these in turn.

*1. Whether Medicaid is only a contract*.--The district court held that "the Medicaid program is a contract between Michigan and the Federal government." *Westside Mothers*, 133 F. Supp. 2d at 557. The program, it points out, is not mandatory; states choose whether to participate. *See* 42 U.S.C. § 1396b (empowering the Secretary to pay funds to states that submit Medicaid plans). If a state does choose to participate, Congress may then "condition receipt of federal moneys upon compliance by the recipient with federal

against a state officer based upon *Ex parte Young*." 517 U.S. at 74. The Medicaid Act allows the Secretary of Health and Human Services to reduce or cut off funding to states that do not comply with the program's requirements. *See Westside Mothers*, 133 F.Supp.2d at 575. This one provision, the district court held, was a detailed remedial scheme sufficient to make *Ex parte Young* unavailable. *See id*.

We disagree. In *Seminole Tribe*, the Supreme Court found *Ex parte Young* was unavailable because Congress had established a "*carefully crafted and intricate* remedial scheme . . . . for the enforcement of a *particular* federal right." 517 U.S. at 73-74 (emphasis added). The mechanism established there included timetables, incentives, and "intricate procedures" to cajole states and Indian tribes to negotiate agreements on gambling. *Id*. at 74. The scheme here, in contrast, simply allows the Secretary to reduce or cut off funds if a state's program does not meet federal requirements. *See* 42 U.S.C. § 1396c. This is not a detailed "remedial" scheme sufficient to show Congress's intent to preempt an action under *Ex parte Young*. *Maryland Psychiatric Soc., Inc. v. Wasserman*, 102 F.3d 717, 719 n* (4th Cir. 1999) (rejecting an assertion that the Medicaid Act's remedial scheme is sufficient to invoke the rule of *Seminole Tribe*).

Plaintiffs seek only prospective injunctive relief from a federal court against state officials for those officials' alleged violations of federal law, and they may proceed under *Ex parte Young*.

#### C.  *Whether there is a private right of action under § 1983*

Section 1983 imposes liability on anyone who under color of state law deprives a person of "rights, privileges, or immunities" secured by the laws or the constitution of the United States. 42 U.S.C. § 1983. The Supreme Court and this court have held that in some circumstances a provision of the Medicaid scheme can create a right privately enforceable against state officers through § 1983. *See Wilder*, 496 U.S. at

elements of Medicaid's screening and treatment program, they seek only to prevent the defendants from doing "what [they] have no legal right to do," and their suit is permitted under *Ex parte Young*.

Third, the district court asserts that *Ex parte Young* is unavailable because the state "is the real party in interest when its officers act within their lawful authority." *Westside Mothers*, 133 F.Supp.2d at 562. It has two reasons for finding Michigan the real party in interest. Its first reason follows from its finding that Medicaid is a contract. If Medicaid were only a contract, then this would be a suit seeking to compel a state to specific performance of a contract. Such suits are barred under a nineteenth century Supreme Court case, *In re Ayers*, 123 U.S. 443 (1887), which held that a "claim for injunctive relief against state officials under the Contracts Clause is barred by state sovereign immunity because the state [is] the real party at interest." *In re Ellett*, 254 F.3d 1135, 1145 (9th Cir. 2001) (explicating *In re Ayers*). We have already held that Medicaid is not merely a contract, but a federal statute. This suit seeks only to compel state officials to follow federal law, and thus is not barred by *Ayers*.

The district court also says erroneously that Michigan is the real party in interest because "[t]here is no personal, unlawful behavior attributed" to the defendants that plaintiffs seek to enjoin. *Westside Mothers*, 133 F.Supp.2d at 570. In their initial complaint, plaintiffs make clear that they are suing the named defendants because of "their failure to provide children in Michigan . . . with essential medical, dental, and mental health services *as required by federal law*." J.A. at 18 (emphasis added).

Finally, the district court refused to allow plaintiffs to proceed under *Young* because of the Supreme Court's holding in *Seminole Tribe* that "[w]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action

statutory and administrative directives." *Westside Mothers*, 133 F. Supp. 2d at 556-57 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).

To characterize precisely the legal relationship formed between a state and the federal government when such a program is implemented, the district court turned to two Supreme Court opinions on related subjects. In *Pennhurst State School and Hosp. v. Halderman* ("*Pennhurst I*"), the Court described the Medicaid program as "much in the nature of a contract," and spoke of the "'contract'" formed between the state and the federal government. 451 U.S. 1, 17 (1981) (quotation marks in original). The relevant passage reads in full:

> Unlike legislation enacted under § 5 [of the Fourteenth Amendment], however, legislation enacted pursuant to the spending power is *much in the nature of* a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress's power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of this *"contract."*

*Pennhurst I* at 17 (emphasis added).

Justice Scalia expanded on this contract analogy in his concurrence in *Blessing v. Freestone*. He maintained that the relationship was "in the nature of a contract" because:

> The state promises to provide certain services to private individuals, in exchange for which the Federal government promises to give the State funds. In contract law, when such an arrangement is made (A promises to pay B money, in exchange for which B promises to provide services to C), the person who receives the benefit of the exchange of promises between two others (C) is called a third-party beneficiary.

520 U.S. 329, 349 (1997) (Scalia, J., concurring).

Drawing on above language, the district judge then concluded that the "Medicaid program is a contract between Michigan and the Federal government," *Westside Mothers*, 133 F.Supp.2d at 557, further describing it as a "contract . . . between sovereigns," and "the Medicaid contract," *id*. at 558. The only significant difference between Medicaid and an ordinary contract, he asserted, is "the sovereign status of the parties," which limits the available remedies each can seek against the other. *Id*.

Contrary to this narrow characterization, the Court in *Pennhurst I* makes clear that it is using the term "contract" metaphorically, to illuminate certain aspects of the relationship formed between a state and the federal government in a program such as Medicaid. It does not say that Medicaid is *only* a contract. It describes the program as "much in the nature of" a contract, and places the term "contract" in quotation marks when using it alone. *Id*., 451 U.S. at 17. It did not limit the remedies to common law contract remedies or suggested that normal federal question doctrines do not apply. Justice Scalia's concurrence in *Blessing* does not alter this.

Binding precedent has put the issue to rest. The Supreme Court has held that the conditions imposed by the federal government pursuant to statute upon states participating in Medicaid and similar programs are not merely contract provisions; they are federal laws. In *Bennett v. Kentucky Department of Education*, Kentucky argued that a federal-state grant agreement "should be viewed in the same manner as a bilateral contract." 470 U.S. 656, 669 (1985). The Court rejected this approach, holding that, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Id*.; *see also Boatman v. Hammons*, 164 F.3d 286, 288 (6th Cir. 1998) ("States . . . must follow federal law in managing the [Medicaid] program"). The fact that these provisions have the binding force of law means that Medicaid and

a federal right under the color of state law." *Hafer v. Melo*, 502 U.S. 21, 30 (1990) (citation omitted).

Of course, *Ex parte Young* is a "fiction" to the extent it sharply distinguishes between a state and an officer acting on behalf of the state, but it is a necessary fiction, required to maintain the balance of power between state and federal governments. "The availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause." *Coeur d'Alene*, 521 U.S. at 293 (quoting *Green v. Mansour*, 474 U.S. at 68). When a court addresses a claim made under *Ex parte Young* it should simply ask "whether a complainant alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id*. at 296 (O'Connor, J., concurring). On its surface this case fits squarely within *Ex parte Young*. Plaintiffs allege an ongoing violation of federal law, the Medicaid Act, and seek prospective equitable relief, an injunction ordering the named state officials henceforth to comply with the law.

The district court nonetheless held that *Ex parte Young* was inapplicable for four separate reasons. Two can be quickly dismissed. First, it held that plaintiffs could not invoke *Ex parte Young* because that doctrine can only be invoked to enforce federal laws that are supreme law of the land. *See Westside Mothers*, 133 F.Supp.2d at 561-62. Since we held above that spending clause enactments are supreme law of the land, they may be the basis for an *Ex parte Young* action. Second, the district court held *Ex parte Young* is unavailable because under this doctrine a court lacks "authority to compel state officers performing discretionary functions." *Id*. at 574. This correctly states the holding in *Young*, but misunderstands what it means by "discretion." "An injunction to prevent [a state official] from doing that which he has no legal right to do is not an interference with the discretion of an officer." *Ex parte Young*, 209 U.S. at 159 (quoted in *Telespectrum, Inc. v. Public Service Com'n of Ky.*, 227 F.3d 414, 422 (6th Cir. 2000)). Since the plaintiffs here claim that the defendants are acting unlawfully in refusing to implement mandatory

### B. Whether the suit is barred under sovereign immunity

The district court next held that the plaintiffs' suit is foreclosed by doctrines of sovereign immunity because Michigan is the "real party at interest" in the suit and plaintiffs cannot invoke any of the exceptions to sovereign immunity that would allow their suit. *Westside Mothers*, 133 F.Supp.2d at 559-60.

As explained by the Supreme Court in many cases, sovereign immunity, though partially codified in the Eleventh Amendment, is a basic feature of our federal system. *See, e.g.*, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 72-73 (1996). There are exceptions. Congress may abrogate a State's immunity from suit under § 5 of the Fourteenth Amendment or a state may consent to suit. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expenses Bd.*, 527 US. 666, 670 (1999). None of the exceptions that allow an individual to sue a state directly are at issue here, however. Though the record is not entirely clear, it appears that plaintiffs at first sued the named defendants under § 1983, and only when the district court expressed skepticism about this avenue of attack did they invoke *Ex parte Young* as an alternative mechanism to reach the defendants. *See Westside Mothers*, 133 F.Supp.2d at 575-76. Because sovereign immunity limits the jurisdiction of the Federal courts, we address it before turning to § 1983.

Under the doctrine developed in *Ex parte Young* and its progeny, a suit that claims that a state official's actions violate the constitution or federal law is not deemed a suit against the state, and so barred by sovereign immunity, so long as the state official is the named defendant and the relief sought is only equitable and prospective. *See* 209 U.S. 123 (1908); *see also, e.g.*, *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). "Since *Ex parte Young* . . . it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of

similar federal grant programs are not subject merely to doctrines of contract interpretation.

*2. Whether acts passed under the Spending Power are Supreme Law of the Land.*--After holding that Medicaid is only a contract to pay money enacted under the spending power, the district court then held that programs enacted pursuant to the Constitution's spending power are not the "supreme law of the land" and do not give rise to remedies invoked for the violation of federal statutes. *See Westside Mothers*, 133 F.Supp.2d at 561-62.[2] Relying on its determination that Medicaid and similar programs are "contracts consensually entered into by the States with the Federal Government . . . ," the district court then reasons that they are "not statutory enactments by which States must automatically submit to federal prerogatives." *Id.*, 133 F.Supp.2d at 561. There are two ways to understand this passage. One is that the district court is merely following the logic of its previous finding, and holding that federal-state programs are not supreme law because they are only contracts. We have already rejected the line of reasoning that begins with the assumption that Medicare is only a contract.

The district court may also be claiming that acts passed under the spending power are not supreme law because the spending power only gives Congress the power to set up these programs, not to force states to participate in them. *See id.* at 561-62. A state can decline to participate in Medicaid. *See id.* at 562. "Because congressional enactments pursuant to the Spending Power that set forth the terms of federal-state

---

[2]The Supremacy Clause states that the "Constitution and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or the Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 2. Congress's spending powers derive from the Spending Clause, which gives it "Power to lay and collect Taxes . . . [to] provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8.

cooperative agreements depend on the voluntary agreement of participating States . . . ," the district court concludes, they are "not within the ambit of the Supremacy Clause [and so] are not the supreme law of the land." *Id*. It erroneously states that its conclusion is dictated "by the [Supreme] Court's holdings in *Alden, Prinz, New York, South Dakota*, and *Pennhurst I*." *Id*. *Alden v. Maine* holds that sovereign immunity prevents the federal government from forcing unconsenting states to submit to suit in their own courts. *See* 527 U.S. 706 (1999). Both *Prinz v. United States*, 521 U.S. 898 (1997), and *New York v. United States*, 505 U.S. 144 (1992), hold that Congress violates the Tenth Amendment if it compels a state to enact legislation or implement a specific regulatory scheme. *South Dakota* upholds the power of Congress to place conditions on a state's receipt of federal funds. 483 U.S. at 211-12. *Pennhurst I* holds that if Congress wishes to impose obligations on states that choose to participate in volitional spending power programs, it must make the obligations explicit. 451 U.S. at 25.

In *Townsend v. Swank*, we do find language by Chief Justice Burger in a one-paragraph concurrence to a unanimous opinion that laws passed under the spending power are "in no way mandatory on the states." 404 U.S. 282, 292 (1971) (Burger, C.J., concurring in the result). The Chief Justice appeared merely to be noting that the Supremacy Clause does not compel states to participate in programs enacted under the spending power. *See Quern v. Mandley*, 436 U.S. 725, 734 (1978) (citing Burger's concurrence to support the proposition that while "federal eligibility standards are mandatory on states that adopt [a program enacted under the spending clause, the law] in no way obligates a state to continue that program"). This concurrence does not establish that spending power enactments are not supreme law of the land. *See O'Brien v. Massachusetts Bay Trans. Auth.*, 162 F.3d 40, 43 n.2 (1st Cir. 1998) (noting that "individual Justices have from time to time suggested that the authority for adhering to Federal law when Congress employs its spending power is not to be located in the Supremacy Clause. But these moments

have been few and far between and . . . have not debilitated the general conclusion that laws of a jurisdiction that receives federal funds must, when a relevant conflict looms, give way to Federal law").

The district court acknowledges that "the Supreme Court has in the past held that federal-state cooperative programs enacted under the Spending Power fall within the ambit of the Supremacy Clause." *Westside Mothers*, 133 F.Supp.2d at 561 (citing *Blum v. Bacon*, 457 U.S. 132 (1982), *Carleson v. Remillard*, 406 U.S. 598 (1972), *Townsend*, 404 U.S. 282). It then states that in "recent years . . . the Supreme Court has conducted a more searching analysis of the nature and extent of the Supremacy Clause," suggesting erroneously that its departure from precedent is dictated by recent Supreme Court jurisprudence. *Id*. The Court has recently held that, when a state agency accepts federal funds appropriated under the spending clause, the supremacy clause requires conflicting local law to yield. *See Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 477-78 (1996) (stating that a provision of a state constitution is invalid if it conflicts with the Medicaid Act); *accord CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993); *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985). The well-established principle that acts passed under Congress's spending power are supreme law has not been abandoned in recent decisions.

Our court has followed these decisions. *See, e.g.*, *Planned Parenthood Affiliates of Mich. v. Engler*, 73 F.3d 634, 637 (6th Cir. 1996) (striking down a provision of Michigan law as conflicting with the Medicaid Act). We have found no decision by any other federal circuit court of appeals to the contrary. We reaffirm well-established precedent holding that laws validly passed by Congress under its spending powers are supreme law of the land.