LUCERO, Circuit Judge,
dissenting.
I dissent.
Litigants and the public at large are entitled to receive decisions from our court rooted in precedent and based on rigorous analysis of the parties’ submissions. Today’s decision meets neither test. Instead, the majority conveniently defenestrates controlling precedent and proceeds on substituted premises. This behavior is particularly unjust because the very rule that the majority would scuttle was conceded by the parties as controlling.
This dissent proceeds in two parts. Part I addresses the case as presented by the parties in their briefing before our court. It speaks to the issues brought to us by the parties for our resolution and argued to our panel. Part II addresses the arguments of my majority colleagues in support of the issues of their own irregular creation and about which they sought additional briefing over my objection.
In initial briefing, all parties acknowledged that Planned Parenthood possesses a cause of action under the Supremacy Clause. The holdings of this court required such an acknowledgement. In his opening brief, Moser cited Qwest Corp. v. City of Santa Fe, 380 F.3d 1258 (10th Cir.2004), and correctly stated that the Tenth Circuit “has allowed an equitable injunction action when a state law is alleged to conflict with federal law in violation of the Supremacy Clause.” Moser predicted that “the Supreme Court will abolish this equitable Supremacy Clause cause of action” in Douglas v. Independent Living Center of Southern California, Inc., — U.S. -, 132 S.Ct. 1204, 182 L.Ed.2d 101 (2012), which was pending at the time his brief was submitted. This prediction proved inaccurate, and Moser advanced no other argument on that issue. Moser thus conceded that our circuit jurisprudence allows for a cause of action under the Supremacy Clause, and Planned Parenthood understandably refrained from addressing this waived issue in its briefing.
I ought not need remind my colleagues that a panel of this court lacks authority to overrule the decisions of prior panels. United States v. Meyers, 200 F.3d 715, 720 (10th Cir.2000). This bedrock principle of stare decisis ensures that parties are treated consistently and invites confidence in the judicial process. See Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). It is “a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon ‘an arbitrary discretion.’ ” *844 Patterson v. McLean Credit Union, 491 U.S. 164, 172, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (quoting The Federalist No. 78, at 490 (Alexander Hamilton) (H. Lodge ed., 1888)). The majority has elected to disregard these principles — it is not our office to do so.
I
A
In Qwest Corp., we held that “[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.” 380 F.3d at 1266 (emphasis added). Qwest claimed that the Federal Telecommunications Act of 1996 preempted several provisions of a Santa Fe ordinance that established new procedures for telecommunications providers seeking to access city-owned property. Qwest Corp., 380 F.3d at 1262. Pursuant to the ordinance, telecommunications providers were required to register with the city and obtain a lease agreement to use city-owned rights-of-way. Id. To register, a telecommunications provider had to pay a fee and provide information regarding its affiliates, the location of existing facilities, the services provided by the company, and “such other information. as the city may reasonably require.” Id. To obtain a lease agreement, Qwest was required to submit an application containing an appraisal, engineering plans, and “such other and further information as may be required by the city.” Id. It would then have to pay a rental price based on the appraisal, and would be required to install excess conduit capacity equal to 100% of what the installer planned to use. Id.
Qwest “sought to install” new telecommunications equipment on a city-owned right-of-way, but after learning that the new ordinance would require a lease for that project and “any use of the City’s rights-of-way,” the company withdrew its application and filed suit in federal district court. Id. at 1262-63. Qwest claimed that various provisions of the ordinance were preempted by 47 U.S.C. § 253, which provides that “[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.” § 253(a). The statute further provides-that if the Federal Communications Commission (“FCC”) “determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) ... the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.” § 253(d).
The panel in- Qwest Corp. concluded that we had federal question jurisdiction because “ ‘[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which', by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.’ ” Qwest Corp., 380 F.3d at 1264 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). We noted that “a federal-law defense ... anticipated in response to the complaint” does not confer jurisdiction, but explained that “the issue of pre-emption is not an anticipated defense, but is the basis for a federal claim in Qwest’s complaint in federal court.” Id. at 1264 n. 1.
Qwest Corp. considered whether the district court erred in concluding that § 253 'did not evince congressional intent “to create a federal right to be free of local laws *845 or regulations that prohibit the provision of any telecommunications service” and thus “that no action under [42 U.S.C.] § 1983 is available.” Qwest Corp., 880 F.3d at 1265. The panel affirmed the district court’s conclusion, holding that the statute did “not reveal a clear congressional intent to create an individual right.” Id. Instead, § 253(d) “calls on the FCC to enforce 253(a).” Qwest Corp., 380 F.3d at 1265.
Although we held that § 253 did not “create[] a right enforceable through 42 U.S.C. § 1983,” Qwest Corp., 380 F.3d at 1265, we nevertheless concluded that Qwest could proceed on a cause of action directly under the Supremacy Clause:
A federal statutory right or right of action is not required where a party seeks to enjoin the enforcement of a regulation on the grounds that the local ordinance is preempted by federal law. A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.
Id. at 1266 (citations and footnote omitted).
On considering the merits of Qwest’s direct Supremacy Clause claims, we affirmed the district court’s ruling that many of the ordinance’s provisions were preempted by § 253. Although bare registration and lease requirements were not per se “prohibitive” under § 253(a), Qwest Corp., 380 F.3d at 1269, it was determined that several specific provisions were preempted, including the requirements that telecommunications providers pay a rental price based on the value determined by a city-approved appraiser, install double capacity when installing new conduit, and provide various forms of information to the city as part of the registration process. Id. at 1270-71, 1274-75.
B
It having been acknowledged by the parties that the cause of action at issue was firmly controlled by circuit precedent, our analysis should have proceeded directly to the merits of Planned Parenthood’s Supremacy Clause claim. Remarkably, the majority did not reach the merits. I would hold that Planned Parenthood possesses standing, has established a likelihood of success on the merits of its claim, and is entitled to a preliminary injunction.
In Bond v. United States, — U.S.-, 131 S.Ct. 2355, 180 L.Ed.2d 269 (2011), a criminal defendant argued that Congress lacked constitutional authority to enact a federal statute that imposed criminal penalties for chemical weapon use. The Court unanimously rejected the argument that Bond lacked standing because she asserted only the legal rights and interests of the states. Id. at 2363. Instead, the Court held that a party “has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable.” Id. at 2364. Citing to a long list of Supreme Court cases in which individual plaintiffs asserted constitutional challenges based on separation-of-powers and checks-and-balances principles, the Court concluded that individual plaintiffs may by analogy “challenge a law as enacted in contravention of constitutional principles of federalism.” Id. at 2365. Bond had standing to raise the federalism issue because she properly sought to vindicate her own interests and could “assert injury from governmental action taken in excess of the authority that federalism defines.” Id. at 2363-64. Thus, the Supreme Court specifically rejected the argument, made by Moser in this case, that an individual advancing a *846 Supremacy Clause challenge asserts only the interests of a government entity.
As did Bond, Planned Parenthood seeks to vindicate its own interests in contending that Section 107(Z) “upset[s] the constitutional balance between the National Government and States.” Bond, 131 S.Ct. at 2364. Thus, Planned Parenthood falls within the ambit of plaintiffs defined by the Supreme Court as having standing so long as it asserts a harm that is “concrete, particular, and redressable.” Id.; see also Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).
The district court determined that Planned Parenthood “has demonstrated convincingly the existence of an injury which may be effectively addressed only by granting the injunction sought.” This finding is entitled to deference and is supported by ample record evidence. Planned Parenthood alleges that Section 107(Z) caused its Wichita and Hays health centers to lose more than $330,000 in funding, will end their eligibility for a low-cost drug-purchasing program, and will likely lead to declines in staffing levels and the closure of the Hays health center. Thus, Planned Parenthood has suffered concrete harm. These injuries are particular because the funding cuts apply only to Planned Parenthood.[1] Finally, the injuries would be redressed by an injunction barring enforcement of Section 107(Z).
Moser cannot rely on Wilderness Society v. Kane County, 632 F.3d 1162 (10th Cir.2011) (en banc), for his contention that Planned Parenthood lacks prudential standing. The Supreme Court’s decision in Bond expressly rejected the conclusion that a party “does not assert a valid right to relief of its own,” Kane Cnty., 632 F.3d at 1170, and thus lacks prudential standing if it asserts that a statute violates constitutional principles of federalism. See Bond, 131 S.Ct. at 2363. Further, the plaintiff in Kane County was a private environmental organization that, according to the en banc majority, sought to assert the property rights of the federal government and “lack[ed] any independent property rights of its own.” 632 F.3d at 1171. Planned Parenthood, in contrast, has direct economic interests at stake in this dispute. It seeks to preserve a crucial funding source, not hypothetical interests in the property rights of another.
C
Under our federal structure, “state law is nullified to the extent that it ... stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Fidelity Fed. Sav. & Loan Ass’n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quotation omitted). This doctrine applies equally to federal regulations. Id. “[T]he Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and [ ] any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.” Planned Parenthood Ass’n of Utah v. Dandoy, 810 F.2d 984, 988 (10th Cir.1987) (quotation omitted).
Title X establishes a broad eligibility standard for grantees, allowing “[a]ny public or nonprofit private entity” to apply for Title X funds. 42 C.F.R. § 59.3. In *847 addition, federal law recognizes that organizations affiliated with abortion providers may participate in Title X and requires only that Title X funds not “be used in programs where abortion is a method of family planning.” 42 U.S.C. § 300a-6; see also Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed.Reg. 41,270, 41,275-76 (July 3, 2000) (describing the separation Title X grantees must maintain between Title X projects and abortion-related activities). By explicitly establishing a broad eligibility standard, the federal government precluded participating states from creating additional, narrower standards.
When other circuits have examined state laws that impose heightened Title X eligibility requirements, they have concluded that such provisions violate the Supremacy Clause. See Planned Parenthood of Hous. & Se. Tex. v. Sanchez, 403 F.3d 324, 337 (5th Cir.2005) (“[A] state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause.”); Planned Parenthood Fed. of Am. v. Heckler, 712 F.2d 650, 663 (D.C.Cir.1983) (“Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs.”); Valley Family Planning v. North Dakota, 661 F.2d 99, 101-02 (8th Cir.1981) (“The conflict between Title X and [the state law at issue] is dear.”).
Section 107(i) is similarly inconsistent with the terms and conditions that Congress and the Department of Health and Human Services (“HHS”) established in allowing KDHE to receive Title X funding. Even without considering Section 107(i)’s underlying purpose, the provision excludes an entire category of providers from eligibility, contravening the federal command that “[a]ny public or nonprofit private entity” may apply for Title X funds. 42 C.F.R. § 59.3. Section 107(Z) directs Title X funding to public entities and then, “if any moneys remain,” to non-public hospitals or federally qualified health centers. 2011 Kan. Sess. Laws 2020. The provision does not mention non-public facilities that solely provide family planning services, such as Planned Parenthood, nor does it provide that, “if any moneys remain” after funds are distributed to non-public hospitals or federally qualified health centers, Title X funding may be distributed to nonpublic family planning providers. Implicitly, such entities.are barred from applying for funds, contrary to 42 C.F.R. § 59.3.
Record review fully supports the district court’s conclusion that Section 107(l) “effectively block[s]” and “exclu[des]” Planned Parenthood from participating in KDHE’s Title X program. Immediately after Section 107(i) was passed, Planned Parenthood was informed that “[d]ue to recent legislative action funding is no longer available for your organization.” KDHE sought alternative subgrantees only after terminating Planned Parenthood’s contracts. Further, KDHE acknowledges that at the time the preliminary injunction was granted, it had not contracted with or located sufficient facilities to replace Planned Parenthood’s service offerings. There is no record evidence that Planned Parenthood’s funding was terminated because KDHE ran out of Title X funding; rather, KDHE had imposed a policy of wholly excluding Planned Parenthood from obtaining Title X funds. We thus are not presented with the hypothetical scenario under which an agency merely prioritizes funding pursuant to a blanket rule. Both the text and the actual implementation of Section 107(i) demonstrate a categorical bar on eligibility for Planned Parenthood.
*848 If Section 107(Z)’s purpose is considered — and it is not necessary to do so before concluding the provision is preempted — the conflict is even clearer. The district court found that Section 107(Z) was intended to “single out, punish, and exclude Planned Parenthood, the only historical Kansas subgrantee which provides or associates with a provider of abortion services, from receiving any further Title X subgrants.” In making this factual finding — entitled to our deference — the district court relied on extensive direct evidence from Section 107(i)’s legislative history. Representative Lance Kinzer, who offered the provision as an amendment to a Kansas appropriations bill, stated in an accompanying press release that the amendment “took all state funding away from Planned Parenthood to ensure that state dollars are not used for abortion services.” Substantially the same press release was circulated by the Communications Director for the Speaker of the Kansas House. Representative Kinzer also stated online: “Delighted to announce that the KS House just approved my floor amendment to deny Title X funding to Planned Parenthood ... a great victory on the first pro-life floor vote of the session.” A news story on the amendment quoted Governor Sám Brownback’s spokeswoman as stating, “Gov. Brownback ... opposes taxpayer subsidy of abortions.” Planned Parenthood submitted an affidavit averring that on the floor of the Kansas legislature, the amendment was repeatedly referred to as the “Planned Parenthood” provision. According to Planned Parenthood, Section 107(i) was part of a nationwide effort to prohibit entities affiliated with abortion providers from receiving government funds unconnected to abortion services.
But Title X’s enacting statute and implementing regulations recognize that entities affiliated with abortion providers may participate in Title X projects as long as Title X funds are not used for abortion programs. 42 U.S.C. § 300a-6; 65 Fed.Reg. at 41,275-76. Section 107(Z)’s goal of disqualifying organizations associated with abortion providers contravenes federal regulations that allow abortion providers and their affiliates to participate in Title X.
Regardless of the statute’s purpose, the text of Section 107(i) and KDHE’s manner of implementing it violate 42 C.F.R. § 59.3 by categorically barring entities such as Planned Parenthood from Title X funding. The district court’s conclusion that Planned Parenthood is likely to prevail on its Supremacy Clause claim is thus fully supported by the record and applicable law, and should be affirmed.[2]
*849 D
Planned Parenthood has demonstrated that the remaining preliminary injunction factors weigh in its favor. See Winter v. Nat’l Res. Def. Council, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (describing the standard for a preliminary injunction).
The record firmly supports the district court’s conclusion that Planned Parenthood “is likely to suffer irreparable harm in the absence of preliminary relief.” Id Plaintiff attests that Section 107(1) caused its health centers to lose more than $380,000 in funding, will end their health centers’ eligibility for a low-cost drug purchasing program, and will likely lead to declines in staffing levels and the closure of one center. Furthermore, Planned Parenthood cannot apply directly to HHS for Title X funding until the next project period begins in 2015. See, e.g., 42 C.F.R. § 59.8(a).
I also agree with the district court’s conclusion that “the balance of equities tips in [Planned Parenthood’s] favor.” Winter, 555 U.S. at 20, 129 S.Ct. 365. The harm to Planned Parenthood outweighs any harm to Moser. As discussed above, the harm to Planned Parenthood is severe. In comparison, the only harm to Moser is that the state will no longer be able to implement its unconstitutional eligibility requirement. Despite Moser’s protests, the Eleventh Amendment does not preclude federal courts from enjoining an ongoing violation of federal law. Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Muscogee Nation v. Okla. Tax Comm’n, 611 F.3d 1222, 1232 (10th Cir.2010). Further, the district court’s order does not harm KDHE revenues because the funding in question is federal money already intended for Planned Parenthood. An injunction merely reestablishes the status quo ante prior to passage of Section 107(i).
Finally, I would also affirm the district court’s conclusion that an injunction is “in the public interest.” Winter, 555 U.S. at 20, 129 S.Ct. 365. Title X plays a key role in ensuring that low-income women and families have access to family planning services. For decades, two Planned Parenthood facilities in Kansas have relied on Title X funds to carry out this mission. Reversal of the district court’s injunction will have immediate consequences for the well-being of the women and families that rely on these centers. Without injunctive relief, Planned Parenthood clients will see their cost of service increase and the range of available services decrease. It is questionable that the replacement facilities Moser has cobbled together can meet community needs to the same degree. For example, KDHE’s 2011 continuation grant application states that the alternative provider in Sedgwick County has no weekend hours and does not provide all the services available at Planned Parenthood facilities. As Title X itself indicates, the public has a strong interest in delivering family planning services to vulnerable populations.
II
A
Instead of undertaking the foregoing analysis, the majority sua sponte announced its skepticism that precedent acknowledged as controlling by all litigants was actually controlling. Over my objections, my colleagues then sought supplemental briefing on two issues not dis *850 cussed in any of the initial briefs: (1) Whether the Administrative Procedure Act (“APA”), 5 U.S.C. §§ 701-06, provides an alternate and exclusive remedy to Planned Parenthood; and (2) whether the precedents of this court require recognition of a cause of action under the Supremacy Clause to enforce Spending Clause legislation. (Sept. 19, 2018 Order 1-2.) It also asked whether those two issues were waived, and if so, whether the waiver stripped this court of jurisdiction. (Id. at 2.)
The majority is correct that waiver is not a jurisdictional bar. But that does not mean it is something to be tossed aside when two judges “are comfortable with the propriety” of addressing a given issue. (Majority Op. 888.) “The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.” NASA v. Nelson, — U.S.-, 131 S.Ct. 746, 756 n. 10, 178 L.Ed.2d 667 (2011) (quotation omitted). “Courts do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties.” Greenlaw v. United States, 554 U.S. 237, 244, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (alteration and quotation omitted). The waiver rule “is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one.” United States v. Burke, 504 U.S. 229, 246, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (Scalia, J., concurring).
The majority pretends that the waiver issue is debatable, stating that Planned Parenthood “may be correct” that the issue was waived. (Majority Op. 836-37.) It is well established that we do not address arguments an appellant does not assert in its opening brief. See Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624 (10th Cir.1998); see also Fed. R.App. P. 28. We “will not craft a party’s arguments for him.” Perry v. Woodward, 199 F.3d 1126, 1141 n. 13 (10th Cir.1999).
This rule carries particular force in the context of affirmative waiver. “A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve.” Wood v. Milyard, - U.S. -, 132 S.Ct. 1826, 1832 n. 4, 182 L.Ed.2d 733 (2012). As the Supreme Court noted in Milyard, consideration of a forfeited issue may be proper in exceptional cases, id. at 1833, but “[a] court is not at liberty ... to bypass, override, or excuse a [party’s] deliberate waiver of a[n affirmative] defense,” id. at 1830. Although jurisdiction may not be created by a party’s concession, In re Am. Ready Mix, Inc., 14 F.3d 1497, 1499 (10th Cir.1994), a private cause of action issue is “not of the jurisdictional sort which the Court raises on its own motion,” Lake Country Estates, Inc. v. Tahoe Reg’l Planning Agency, 440 U.S. 391, 398, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (quotation omitted). When a defendant does not contest the existence of a cause of action, the proper course is to “assume[ ], without deciding, that the suit could properly be brought.” Id. (quotation omitted); see also Morris v. Okla. Dep’t of Human Servs., 685 F.3d 925, 932 n. 4 (10th Cir.2012) (“[W]e will assume without deciding that a cause of action exists when defendants fail to dispute it.”).[3]
*851 The majority provides neither a reasoned basis for its rejection of Moser’s concession nor a compelling justification for its argument of the causé of action issue on his behalf. “Today’s decision is backwards in many senses. It elevates the majority’s agenda over the litigants’ submissions .... ” Citizens United v. FEC, 558 U.S. 310, 478, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (Stevens, J., dissenting). Mil-yard strongly suggests that a court has no discretion to raise sua sponte an affirmative defense that has been waived, rather than forfeited. See 132 S.Ct. at 1830, 1832 n. 4. But even assuming this rule is not absolute, a court should depart from regular practice only in “exceptional cases.” Id. at 1833. What makes this case so exceptional that affirmative waiver should be ignored? The majority is wholly silent, citing only its comfort with employing an extraordinary and irregular procedure. The public will fill that silence with its own explanations. See Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (describing “necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments”).
B
The majority’s call for additional briefing constitutes nothing more and nothing less than an attempt to find a way to distinguish Qwest Corp. Having received briefing on the subject, my colleagues invent and apply a four-part test for determining whether the Supremacy Clause “authorize[s] an injunction against ... state action.” (Majority Op. 817.) Two elements of the four-part test rely on precisely the sort of statutory interpretation that this court has already held is not part of the analysis for determining whether a plaintiff may proceed directly under the Supremacy Clause. The fourth element, the absence of an “enforcement action,” {id. at 817), was also present in Qwest Corp. and thus fails to distinguish our controlling circuit precedent. This leaves the majority’s third element, Title X’s status as Spending Clause legislation. Numerous courts have already held this to be a distinction without a difference. The majority also argues (though it does not incorporate the claim into its assumedly controlling four-part standard) that potential APA remedies are a relevant consideration. (Majority Op. 824-26.) But this asserted dissimilarity also fails because the plaintiffs in Qwest Corp., as in this.case, might have sought a remedy by suing a federal agency under the APA.
1
The majority repeatedly asserts that “[wjhether to recognize a private cause of action for injunctive relief [under the Supremacy Clause] is a matter of statutory interpretation.” (Majority Op. 822; see also id. at 817, 823.) Specifically, the majority says that to determine whether a cause of action exists under the Supremacy Clause we must decide whether “the statute ... specifically authorize^] injunc-tive relief’ and whether “the statute ... create[s] an individual right.” (Id. at 817.) This newly conjured test cannot be squared with our precedent. After evaluating the federal statute at issue in Qwest Corp., we concluded that “nothing in the text or structure of [the statute at issue] indicates an intention to create a private right.” 380 F.3d at 1265. Nonetheless, *852 we unanimously held that the plaintiff had a cause of action under the Supremacy Clause. Id. at 1266.
Engaging in an unwarranted exercise in statutory interpretation, the majority announces that plaintiff lacks a cause of action under the Supremacy Clause because “Title X does not ‘display[] an intent to create’ the remedy sought by Planned Parenthood.” (Majority Op. 828 (quoting Alexander v. Sandoval, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)).) Thus the majority imports wholesale the test for determining whether a statutory right of action exists in concluding that Planned Parenthood may not proceed directly under the Supremacy Clause. See Alexander, 532 U.S. at 286, 121 S.Ct. 1511 (“The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.”); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 290, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) (“[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms — no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action.”).
As we explained in Qwest Corp., however, an implied right of action is distinct from a Supremacy Clause claim: “ ‘A claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied private right of action is a means of enforcing the substantive provisions of a federal law.’ ” 380 F.3d at 1266 (quoting Western Air Lines, Inc. v. Port Auth., 817 F.2d 222, 225 (2d Cir.1987)). The test to determine whether one may assert a claim directly under the Supremacy Clause cannot be identical to the statutory cause of action analysis because we expressly held in Qwest Corp. that “[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.” Id. If, through its legerdemain, the majority intended to place' some daylight between the Supremacy Clause analysis and the analysis for an implied private right of action under a statute, it has not done so. To the contrary, and in obvious contravention of our prior precedent, there are no cases under the first two prongs of the majority’s novel test in which a plaintiff could lack a statutory cause of action but possess one under the Supremacy Clause.
2
My colleagues also argue that Qwest Corp. is distinguishable because Planned Parenthood, unlike Qwest, cannot be subjected to an “enforcement action” arising from § 107(i). (Majority Op. 834-35.) This assertion misconstrues Qwest Corp., which enjoined several provisions of a local ordinance that could not have led to an enforcement action.
The majority cites the dispositional section of the district court opinion we reviewed in Qwest Corp., (Majority Op. 835 n. 5), which enjoined Santa Fe and its agents “from taking any enforcement action against Qwest Corporation” based on certain preempted provisions. Qwest Corp. v. City of Santa Fe, 224 F.Supp.2d. 1305, 1332 (D.N.M.2002). From this, I am led to presume that the majority would hold that if a district court enjoins enforcement, enforcement is possible under the statute.
But that cannot be right, because the district court opinion on review today orders the following: “[T]he defendants are hereby enjoined from any further enforcement or reliance on Section 107(Z) of H.B. 2014.... ” Planned Parenthood of Kan. & *853 Mid-Mo. v. Browriback, 799 F.Supp.2d 1218, 1236 (D.Kan.2011). Perhaps the majority believes that the Qwest Corp. district court’s use of the word “action,” compared to the district court order on review today that merely enjoins “enforcement,” works some magic that makes the two statutes distinguishable — one subject to mere enforcement and unchallengeable in a Supremacy Clause suit, the other presenting the possibility of “enforcement actions” and giving rise to potential Supremacy Clause litigation. That would be an odd approach, given that we can make our own determination without resorting to semantic trivialities.
A review of the provisions enjoined in Qwest Corp. makes it pellucid that an enforcement action would have been logically impossible. The majority incorrectly suggests that Qwest only wanted , to “continue[ ] to provide telecommunications service as it had in the past.” (Majority Op. 835 n. 5.) Instead, the dispute began when “Qwest sought to install a four-by-four foot utility cabinet on a twelve-by-eighteen foot concrete pad on a city-owned right-of-way.” Qwest Corp., 380 F.3d at 1262. Much of the challenge centered on the requirements for installing new telecommunications facilities. By the majority’s own definition of the term — “an adversary legal proceeding to impose a sanction for engaging in prohibited activity,” (Majority Op. 835) — Qwest was not and could not have been subjected to an “enforcement action” for violating these provisions.
For example, the requirement that telecommunications companies provide the city certain, information as part of the registration process logically cannot be “enforced” against the company in an “action” as the majority uses those terms. And Qwest could not possibly raise preemption of the information requirement as a “defense” in an “enforcement action.” If Qwest failed to provide the information, it simply would be ineligible for a government benefit: the opportunity to lease city-owned rights-of-way. The majority fails to provide a scenario under which the city might “enforce” this provision in a coercive action that would place Qwest in a posture to raise preemption as a defense. Similarly, the Qwest Corp. panel barred enforcement of the double-conduit and appraisal-based rental requirements in the Santa Fe ordinance. 380 F.3d at 1271. The opinion says nothing about a potential adversarial enforcement action of these forward-looking provisions, instead holding that “the substantial increase in costs imposed by the excess conduit requirements and the appraisal-based rent ... in themselves renders those provisions prohibitive.” Id. (emphasis added). If a “substantial increase in costs” is by itself sufficient for a private party to assert a successful cause of action under the Supremacy Clause, the possibility of an enforcement action cannot be an essential part of the claim.
My colleagues do not explain how the preempted provisions of the Santa Fe ordinance could have given rise to an enforcement action, or how preemption of the ordinance could possibly serve as a defense. If Qwest violated the terms of its license by failing to provide service, it might have raised some sort of impossibility defense in regulatory proceedings to explain its failure, but a claim that the ordinance is preempted would not invalidate the regulations requiring service provision. Alternatively, I suppose, Qwest could have simply trespassed on a city-owned right-of-way and installed new telecommunications facilities. In that circumstance, it may have been subject to sanctions for trespass, but again, the challenged provisions of the ordinance would not form the basis of such an action and a *854 claim that the ordinance was preempted could not possibly serve as a defense.[4]
The Qwest Corp. opinion specifically held that “the issue of pre-emption is not an anticipated defense, but is the basis for a federal claim in Qwest’s complaint in federal court.” 380 F.3d at 1264 n. 1 (emphasis added). We affirmatively held, with respect to a local ordinance that merely imposed conditions on the receipt of government benefits, that “[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.” Id. at 1266. This holding was joined in relevant part by the author of today’s majority opinion.
Because Qwest was not defending against a threatened enforcement action, its position is precisely analogous to that of Planned Parenthood. The majority says “Qwest’s concern was that Santa Fe was effectively prohibiting it from providing telecommunications service.” (Majority Op. 835 n. 5.) Similarly, Planned Parenthood’s concern in this case is that Kansas is effectively “preventing] Planned Parenthood from participating in the Title X program.” (Planned Parenthood Answer Br. 2.) In both cases, a local law denies what federal law guarantees. Both plaintiffs sought to access government benefits but were thwarted by a law that conflicts with a federal statute. Both advanced a cause of action directly under the Supremacy Clause to redress their grievances. Both requested an order enjoining enforcement of the allegedly preempted law: Qwest sought “an injunction to prevent the enforcement” of Santa Fe’s ordinance, Qwest Corp., 380 F.3d at 1262, and Planned Parenthood similarly seeks an injunction “to prevent the application and enforcement” of Section 107(Z), Planned Parenthood of Kan. & Mid.-Mo., 799 F.Supp.2d at 1220; see also 2011 Kan. Sess. Laws 2020; 30 Kan. Reg. 793 (June 9, 2011). “Enforcement” in this context simply means conditioning benefits in a manner inconsistent with federal law.
Moreover, Qwest Corp. was not this court’s final word as to the existence of a Supremacy Clause cause of action. In Chamber of Commerce of the United States v. Edmondson, 594 F.3d 742 (10th Cir.2010), this court held that the plaintiffs “have a valid right of action under the Supremacy Clause” to challenge three provisions of Oklahoma law as preempted. 594 F.3d at 756 n. 13. Because our circuit precedent in Qwest Corp. was controlling on this point, we declined to reach one defendant’s argument that the plaintiffs lacked a cause of action under § 1983. Edmondson, 594 F.3d at 756 n. 13. As in Qwest Corp., the plaintiffs challenged a statutory provision that simply limited access to government benefits and thus could not logically lead to an “enforcement action.” The panel majority concluded that plaintiffs possessed a cause of action directly under the Supremacy Clause to challenge Okla. Stat. tit. 25, § 1313(B)(2), which prospectively barred public employers from entering into contracts with entities that refused to use a certain employment verification system. Edmondson, 594 F.3d at 753-54, 756 n. 13. The Supremacy Clause could not logically be used as a *855 defense to this provision in a hypothetical “enforcement action” because such an enforcement action could never occur. The statute at issue in Edmondson merely directed state officials not to sign certain contracts.[5]
The majority’s claim, that Planned Parenthood, unlike Qwest' and the Chamber of Commerce, faces no “enforcement action” arises from a semantic contortion. I am reminded of Justice John Marshall Harlan’s guidance: “[AJlmost any word or phrase may be rendered vague and ambiguous by dissection with a semantic scalpel. I do not, however, consider it a provident use of the time of this Court to coach what amounts to little more than verbal calisthenics.” Cole v. Richardson, 397 U.S. 238, 240, 90 S.Ct. 1099, 25 L.Ed.2d 275 (1970) (Harlan, J., concurring in the result). The majority’s attempt to distinguish away a binding precedent on the basis of one district court’s single use of the phrase “enforcement action” constitutes precisely the sort of verbal calisthenics that Justice Harlan warned against.
3
Having failed to distinguish Qwest Corp. on three of the elements identified in its novel test, the majority suggests that our circuit has not found that a Supremacy Clause cause of action exists if the “federal law [at issue] is Spending Clause legislation.” (Majority Op. 828.) The Supreme Court has stated that “legislation enacted pursuant to the spending power is much in the nature of a contract.” Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (“Pennhurst /”). Therefore, says the majority, we should look to the legislation to determine which remedies are available, because “[s]tates, being political animals, likely prefer placing enforcement power exclusively with a federal agency” and “[w]e should not impose on the States the burden of private suits unless the Spending Clause legislation ‘unambiguously’ so requires.” (Majority Op. 826.) My colleagues fail to explain why state preferences ought to be treated more deferentially than the Constitution’s explicit statement that “[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. In any event, a state should be well aware “of what its burdens are before it accepts the federal funds and assumes the concomitant responsibilities,” (Majority Op. 826), given that the clear text of the Supremacy Clause informs the states that they are obligated to follow federal law. Today’s majority opinion makes it less clear to the states what their burdens are by introducing confusion into what was once clear and unambiguous circuit precedent.
Four circuits have considered the argument that Spending Clause legislation is fundamentally different from other legislation for Supremacy Clause purposes. None found any merit in the argument. *856 My colleagues do not even acknowledge, much less attempt to distinguish, the countervailing positions of the Fourth, Fifth, Sixth, and Eighth Circuits in choosing to create a deliberate circuit split.
In Westside Mothers v. Haveman, 289 F.3d 852 (6th Cir.2002), the Sixth Circuit rejected a district court opinion stating “that Medicaid was only a contract between a state and the federal government, that spending-power programs such as Medicaid were not supreme law of the land, ... [and] that in this case Ex parte Young was unavailable.” Westside Mothers, 289 F.3d at 857. The district court had relied on the same language from Pennhurst I that undergirds the majority opinion. Westside Mothers v. Haveman, 133 F.Supp.2d 549, 557 (E.D.Mich.2001). The Sixth Circuit explained that the Supreme Court “is using the term ‘contract’ metaphorically, to illuminate certain aspects of the relationship formed between a state and the federal government in a program such as Medicaid.” Westside Mothers, 289 F.3d at 858. The Supreme Court, it added, had already explicitly rejected a Medicaid-as-contract theory, holding that “ ‘unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.’ ” Id. (quoting Bennett v. Ky. Dep’t of Educ., 470 U.S. 656, 669, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985)). It went on to review several Supreme Court decisions striking down state enactments as inconsistent with Spending Clause legislation. Id. at 860 (citing Dalton v. Little Rock Family Planning Servs., 516 U.S. 474, 477-78, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996); Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1, 469 U.S. 256, 269-70, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985)). Finally, the court ruled that because “spending clause enactments are supreme law of the land, they may be the basis for an Ex parte Young action.” Westside Mothers, 289 F.3d at 861.
The Fifth Circuit adopted the Sixth Circuit’s Westside Mothers reasoning in Frazar v. Gilbert, 300 F.3d 530 (5th Cir.2002), rev’d on other grounds sub nom. Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). The state of Texas urged the court to adopt the reasoning of the district court in Westside Mothers and recognize a “Spending Clause exception to the Ex Parte Young exception to the Eleventh Amendment.” Frazar, 300 F.3d at 550 (quotation omitted). The Fifth Circuit easily rejected this invitation to depart from settled practice, explaining that, “[f]or purposes of the Supremacy Clause and Ex Parte Young, the mandates set out in [the] Medicaid statute are more than contractual; they are federal law.” Frazar, 300 F.3d at 550.
In Missouri Child Care Ass’n v. Cross, 294 F.3d 1034 (8th Cir.2002), the court described as an “unusual assertion” state officials’ argument “that Ex parte Young does not apply” to claims based on Spending Clause legislation because such legislation is “not part of the supreme law of the land under the Supremacy Clause.” 294 F.3d at 1040. The court roundly rejected the argument that Spending Clause legislation “amounts to nothing more under the Constitution than a contract to be interpreted under ordinary contract principles,” holding that the defendants’ contention was based on a “misinterpretation of] language from the Supreme Court’s opinions in Pennhurst [I] and Blessing [v. Freestone, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)].” Mo. Child Care Ass’n, 294 F.3d at 1040. Citing Westside Mothers, the Eighth Circuit declined to “make the logical leap ... from describing such programs as ‘like contracts’ to treating such programs ‘as nothing more than contracts.’ Like the Sixth Circuit, we re *857 fuse to make that leap, as it is unsupported by the applicable case law.” Mo. Child Care Ass’n, 294 F.3d at 1041.
Finally, in Antrican v. Odom, 290 F.3d 178 (4th Cir.2002), the court rejected the defendants’ argument that “Spending Clause legislation! ] is not supreme law and therefore does not fall within Ex Parte Young’s defining purpose, which is to give life to the Supremacy Clause.” 290 F.3d at 188 (quotations omitted). The defendants’ “novel position,” the court concluded, is “at odds with existing, binding precedent.” Id. “[T]he Supreme Court has treated the Medicaid Act as ‘supreme’ law and has invalidated conflicting State law under the Supremacy Clause.” Id. (citing Dalton, 516 U.S. at 478, 116 S.Ct. 1063).
Today’s majority might respond that these cases are distinguishable because they were brought under statutes enforceable utilizing § 1983.[6] But merely pointing out a difference in procedural posture does not overcome the majority opinion’s failure to ' explain why Spending Clause legislation is somehow less supreme than legislation passed pursuant to other constitutional clauses. And although the majority does not take the clearly erroneous position that Spending Clause legislation is not the law of the land, its attempt to limit the Supremacy Clause has the same effect.
The majority’s sole support for its extreme proposition is its citation to dicta in Pennhurst I. In addition to the foregoing circuit court holdings, the Supreme Court itself has cautioned against over-reading the Pennhurst I analogy, noting that it “do[es] not imply, for example, that suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to all issues that they raise.” Barnes v. Gorman, 536 U.S. 181, 188 n. 2, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Rather than looking to the well-reasoned decisions of other courts, the majority rests on policy arguments in favor of uniformity. I note that judicial decisions provide such uniformity when judges faithfully observe precedent, and that today’s opinion creates disuniformity by placing our circuit in direct conflict with several others that have considered similar issues, as well as with our own cases.
Moreover, the majority’s contention that states have not consented to suits to enjoin ongoing violations of federal law is a dramatic and unwarranted expansion of the principles announced in Pennhurst I. (See Majority Op. 825-26.) In that case, the Court noted that the $1.6 million grant provided under the Spending Clause legislation at issue was “woefully inadequate to meet the enormous financial burden” of the alleged conditions attached to that grant. Pennhurst I, 451 U.S. at 24, 101 S.Ct. 1531. Planned Parenthood does not seek damages, nor does it attempt to impose costs on the state in excess of the funds provided by the federal government. It merely argues that KDHE should be *858 enjoined from prospectively violating federal law by misdirecting federal funds.
The Court has stressed the unanticipated financial liability rationale as fundamental to its Spending Clause jurisprudence. With respect to “legislation enacted pursuant to Congress’ authority under the Spending Clause ... private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue.” Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 640, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (emphasis added). Similarly, after acknowledging an implied injunctive or equitable remedy for Title IX violations, the Court in Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), noted the need to “examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with [a Spending Clause] condition,” and held that its “central concern in that regard is with ensuring that the receiving entity of federal funds has notice that it will be liable for a monetary award.” Id. at 287, 118 S.Ct. 1989 (quotation and alteration omitted).
In light of these cases, I am baffled by the following assertion by the majority: “Presumably the Qwest court would not have thought it untoward to consider whether to distinguish Spending Clause legislation from other legislation with regard to whether it created a cause of action for damages. The same should be true for a cause of action for injunctive relief.” (Majority Op. 834.) In the context of Spending Clause legislation, the Supreme Court has clearly explained that unanticipated financial liability through private damages actions is paramount in determining whether a state may be sued. The possibility of injunctive relief does not implicate the same concerns. Immediately after the text quoted by the majority, (Majority Op. 825-26), the Pennhurst I decision explains, “in return for federal funds, the States agree to comply with federally imposed conditions.” 451 U.S. at 17, 101 S.Ct. 1531. And under traditional equitable principles, “[a]n injunction to prevent [a state official] from doing that which he has no legal right to do is not an interference with the discretion of an officer.” Ex parte Young, 209 U.S. at 159, 28 S.Ct. 441.
4
The majority also suggests that the potential availability of a remedy under the APA should make us reluctant to consider a Supremacy Clause challenge. (Majority Op. 824-25.) This is, to put it mildly, an invented claim that finds no support in precedent or practice. The majority cites Gonzaga, 536 U.S. at 290, 122 S.Ct. 2268, for the proposition that “[t]he advantages of ... centralized, expert administration do not appear to be controversial and would be obvious to Congress.” (Majority Op. 825.)
If the availability of APA review were a relevant factor in determining whether a cause of action under the Supremacy Clause exists, Qwest Corp. itself would have been decided differently. In that case, Qwest argued that the Federal Telecommunications Act, specifically 47 U.S.C. § 253, preempted the local ordinance at issue. That statute includes the following provision:
If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or *859 legal requirement to the extent necessary to correct such violation or inconsistency.
§ 253(d).
Section 253(d) grants power to the FCC; presumably an action filed under the APA to compel the FCC to “preempt the enforcement of such statute,” id., would have been available to Qwest. Such an action would have promoted “[t]he advantages of ... centralized, expert administration.” (Majority Op. 825.) The Qwest Corp. panel expressly acknowledged other courts’ holding “that 47 U.S.C. § 253(d) calls on the [FCC] to enforce 253(a) and 253(b).” 380 F.3d at 1265. Yet none of the panel members, including the author of today’s majority opinion (who wrote separately in Qwest Corp.), concluded that the possibility of an APA action foreclosed Qwest’s suit against Santa Fe.[7]
Today’s majority cites Chief Justice Roberts’ dissent in Douglas for the proposition that “[allowing for both Supremacy Clause actions and agency enforcement threatens potential inconsistency or confusion, and imperils the uniformity that Congress intended by centralizing administration of the federal program in the agency-” (Majority Op. 825.) I am sure my colleagues are well aware that dissents, even those “not challenged by any other Justice on [a particular] point,” (id. at 826), and even those whose reasoning the majority finds sound, (id. at 827), are not law. To my knowledge, no court has ever held that the hypothetical possibility of bringing a suit against an agency under the APA forecloses a litigant from bringing an entirely different suit against a state or a municipality. The majority certainly does not direct the reader to any such case, nor does it suggest that the text of the APA provides any support for its position. And because this entirely novel factor was also present in Qwest Corp., it provides the majority no shelter.
In its eagerness to jettison the binding holding of Qwest Corp., the majority omits a series of cases that undermine its assertion that a Supremacy Clause action is unavailable because “statutory requirements should be enforced through the administering agency.” (Majority Op. 828.) In Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court considered the circumstances under which a traditional equitable cause of action under Ex parte Young might be curtailed based on concerns of interference with executive administration. The Court concluded that such suits are unavailable only if “Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right.” Seminole Tribe, 517 U.S. at 74, 116 S.Ct. 1114. But “[t]he fact that the Federal Government can exercise oversight of a federal spending program and even withhold or withdraw funds ... does not demonstrate that Congress has displayed an intent not to provide the more complete and more immediate relief that would otherwise be available under Ex parte Young. ” Va. Office for Prot. & Advocacy v. Stewart, — U.S. -, 131 S.Ct. 1632, 1639 n. 3, 179 L.Ed.2d 675 *860 (2011) (quotation omitted).[8] Because the Seminole Tribe doctrine already provides an important limitation on direct Supremacy Clause causes of action, effectively limiting the possibility of interference with a comprehensive statutory scheme, the majority’s decision to create a new and far more restrictive test is- all the more indefensible.
C
The majority’s asserted rationales for distinguishing Qwest Corp. and Edmondson are unavailing. But I am also troubled by the way the majority opinion would undermine the precedents of the Supreme Court and our court to reach its conclusion. I fear that today’s opinion creates a dangerous norm that will allow future litigants to undermine and re-litigate issues once thought to be settled law, depriving the public of the “evenhanded, predictable, and consistent development of legal principles.” Payne, 501 U.S. at 827, 111 S.Ct. 2597.
1
To justify its conclusion that neither Qwest Corp. nor Edmondson binds this panel, the majority writes: “In neither was the existence of a Supremacy Clause cause of action disputed.” (Majority Op. 833.) The majority characterizes our holding in Qwest Corp. as “four conclusory sentences, citing decisions by two other circuits.” (Id. at 834.) It adds, “[tjhere was no need for any additional analysis because no one disputed the existence of a cause of action.” (Id. at 834.) And because Edmondson simply applied the rule articulated in Qwest Corp., its discussion of the cause of action issue was even barer. The majority infers from -the brevity of these discussions that they failed to “definitively resolve[ ] the issue before us.” (Id. at 833.) With no small degree of hubris, the majority opinion suggests that the Qwest Corp. panel improperly reached out to decide an unargued issue. (But see Majority Op. 822-36.)
But to make that conclusion, my colleagues must rely not on the published opinions of this court or the Court, but instead (erroneously, see Part II.C.2, infra) on the briefs and pleadings of the parties in earlier decided cases, (see Majority Op. 833, 835 n. 5). Neither Qwest Corp. nor Edmondson indicates that the cause of action issue was undisputed; the majority makes this claim based on an incorrect reading of briefs filed in those cases. This approach does violence to any reasonable conception of precedent and potentially undermines countless decisions of this court. The existence of a cause of action in Qwest Corp. was unambiguously decided by the panel. A later panel is not entitled to announce — based entirely on its reading of the briefs in a previous case— that a holding is invalid. Such an ap *861 proach reduces the certainty and predictability that are central to the principle of stare decisis. Any future litigant unsatisfied with an unambiguous holding of this court may now apparently turn to documents authored not by an Article III judge, but by the interested parties, and convince a subsequent panel to re-try the case.
A person seeking to understand the law in this circuit should not have to read briefs in already decided cases to capture the meaning of a published opinion of our court. When a panel of this court- writes, “[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right, of action,” Qwest Corp., 380 F.3d at 1266, it should not be necessary to look past that statement and decide whether that issue was sufficiently “disputed” to make that statement by this court binding law. By relying on its own assessment to undermine a precedent that both parties to this litigation treated as settled, the majority establishes a norm that permits infinite relitigation of our court’s holdings.
2
In any event, the majority’s claim that the existence of a Supremacy Clause cause of action was undisputed is erroneous. In its combined opening and answer brief,[9] the City of Santa Fe advanced a jurisdictional argument intertwined with the question of whether the Supremacy Clause provides a cause of action. The majority correctly states that the existence of a cause of action and the question of jurisdiction are distinct, (Majority Op. 831-32), but in light of the specific arguments advanced by the parties in Qwest Corp., the questions collapsed into a single inquiry.
Santa Fe argued that Qwest lacked a cause of action under either § 1983 or § 253 of the Federal Telecommunications Act. (See City of Santa Fe Combined Opening and Answer Br. 2.) It thus stated that the district court’s decision “rests federal jurisdiction solely on the Supremacy Clause” and that this was error because “the Supremacy Clause cannot in and of itself confer ‘arising under’ jurisdiction.” (Id.) The City argued that although the Supremacy Clause might provide a defense based on federal law, “under the well-pleaded complaint rule, a federal defense does not show that ‘the plaintiffs original cause of action arises under the Constitution.’ ” (Id. at 2-3 (quoting Franchise Tax Bd. v. Laborers Vacation Trust, 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).) In its conclusion, the City explicitly equated the jurisdictional and cause of action questions, arguing that if the court “finds that Qwest’s complaint fails to state a federal cause of action, the court should remand with instructions to dismiss for want of jurisdiction under 28 U.S.C. § 1331.” (Id. at 58.)
Qwest responded that “private plaintiffs seeking injunctive or declaratory relief may challenge local telecommunications ordinances under the Supremacy Clause, regardless of whether the Telecom Act confers a private right of action.” (Qwest Reply Br. 2-3.) In a footnote, Qwest noted that “[e]ven in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption.” (Id. at 2 n. 4 (quoting Bud Antle, Inc. v. Barbosa, 45 F.3d 1261, 1269 (9th Cir.1995)).) The City of Santa Fe replied that the relevant precedent “does not hold that federal courts have jurisdiction to enjoin local telecommunications or *862 dinances, even absent a private right of action.” (City of Santa Fe Reply Br. 2.)
As the foregoing makes clear, Santa Fe ásserted two premises: (1) that Qwest lacked a federal cause of action; and (2) that a federal cause of action was a precondition of federal question jurisdiction. The Qwest Corp. panel might have disposed of Santa Fe’s jurisdictional argument by rejecting the second premise • and holding that federal question jurisdiction can exist even without a federal cause of action. In Grable & Sons Metal Products v. Darue Engineering & Manufacturing, 545 U.S. 308, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005), decided the year after Qwest Corp., the Supreme Court “resolve[d] a split within the Courts of Appeals on whether ... a federal cause of action [is] a condition for exercising federal-question jurisdiction,” by holding just that. Id. at 311— 12, 125 S.Ct. 2363. But the Qwest Corp. panel instead addressed the first premise, ruling that “the issue of pre-emption is not an anticipated defense, but is the basis- for a federal claim,” 380 F.3d at 1264 n. 1, specifically, a direct “claim under the Supremacy Clause,” id. at 1266.
Because this legal conclusion was a necessary step in the court’s decisional path, it is a binding holding. See Yost v. Stout, 607 F.3d 1239, 1244 n. 6 (10th Cir.2010) (“A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment.” (quotation and emphasis omitted)). And despite the majority’s attempt to limit Qwest Corp. to a misstated version of its specific facts, “[t]he precedent of prior panels which this court must follow includes not only the very narrow holdings of those prior cases, but also the reasoning underlying those holdings, particularly when such reasoning articulates a point of law.” United States v. Meyers, 200 F.3d 715, 720 (10th Cir.2000).
D
There are but two exceptions to the rule that one panel may not overrule another: superseding en banc review or intervening Supreme Court decisions. See Rezaq v. Nalley, 677 F.3d 1001, 1012 n. 5 (10th Cir.2012). The majority does not identify any such superseding decisions. Instead, the majority relies on the dissent in Douglas in its attempt to rewrite our circuit jurisprudence. Again, a dissent is not superseding Supreme Court precedent. To the extent the majority is drawn to the Douglas dissent, it is free to argue for en banc reversal of Qwest Corp. See Fed. R.App. P. 35. But it is not at liberty to usurp the authority of the Supreme Court or our en banc court and overturn Qwest Corp. on its own.
There can be no doubt that the Douglas dissent is incongruous with our circuit precedent. The dissenting Justices in that case would have established a blanket rule: “the Supremacy Clause does not provide a cause of action to enforce the requirements of [a federal statute] when Congress, in establishing those requirements, elected not to provide such a cause of action in the statute itself.” Douglas, 132 S.Ct. at 1212 (Roberts, C.J., dissenting); see also id. (“Thus, if Congress does not intend for a statute to supply a cause of action for its enforcement, it makes no sense to claim that the Supremacy Clause itself must provide one.”). These statements are the antithesis of our holding in Qwest Corp. that “[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.” 380 F.3d at 1266. Tellingly, despite the majority’s extensive quotation of the Douglas dissent, these passages are *863 omitted. The majority nevertheless applies them.
Other than the Douglas dissent, the majority provides no support for its novel theory of Supremacy Clause jurisprudence. The text of the Constitution does not assist the majority’s attempt to limit these claims. The Supremacy Clause states:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
U.S. Const, art. VI, cl. 2. It does not distinguish between preemption of state “enforcement actions” and laws that interfere with positive federal rights, nor does it exclude Spending Clause legislation.
The majority finds no support in majori-tarian Supreme Court opinions. This is because our holding in Qwest Corp. is fully in line with Supreme Court practice. In Shaw, the Court explained that “[i]t is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.” 463 U.S. at 96 n. 14, 108 S.Ct. 2890 (citing Ex parte Young, 209 U.S. at 160-62, 28 S.Ct. 441). And the Court notes that it “frequently has resolved pre-emption disputes in a similar jurisdictional posture.” Id. As numerous commentators and courts — including our own — have noted, “[t]he best explanation of Ex parte Young and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution and laws.” Charles Alan Wright et al., 13D Federal Practice and Procedure § 3566, at 292 (3d ed.2008); see Joseph A. ex rel. Wolfe v. Ingram, 275 F.3d 1253, 1265 (10th Cir.2002) (quoting Charles Alan Wright et al., 13B Federal Practice and Procedure § 3566, at 102 (2d ed.1984)); Burgio & Campofelice, Inc. v. N.Y. Dep’t of Labor, 107 F.3d 1000, 1006 (2d Cir.1997) (quoting same); Guar. Nat’l Ins. Co. v. Gates, 916 F.2d 508, 512 (9th Cir.1990) (quoting same); see also Richard H. Fallon et al., Hart and Wechsler’s The Federal Courts and the Federal System 807 (6th ed.2009) (describing as “well established” “the rule that there is an implied right of action to enjoin state or local regulation that is preemptéd by a federal statutory or constitutional provision”).
The Supreme Court has explicitly rejected the majority’s assertion that only preemptive defenses are permitted under the Supremacy Clause. In Franchise Tax Board, a case decided the same day as Shaw, the Court explained that “a claim of federal preemption does not always arise as a defense to a coercive action.” 463 U.S. at 12 n. 12, 103 S.Ct. 2841. This holding fits neatly with the Court’s prior pronouncement that “the prospective relief authorized by Young ‘has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely a shield, for those whom they were designed to protect.’ ” Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting Edelman v. Jordan, 415 U.S. 651, 664, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).
Moreover, the Court has repeatedly addressed the merits of Supremacy Clause claims that do not involve “enforcement actions” and are based on Spending Clause legislation. In Pharmaceutical Research & Manufacturers of America v. Walsh, 538 U.S. 644, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003), seven Justices (three in the plurality, one concurring, and three *864 in dissent) reached the merits of preemption claims concerning a state law that provided for the public identification of manufacturers who refused to participate in a rebate program, and forbade the dispensation of drugs from non-compliant manufacturers to state Medicaid beneficiaries without “prior authorization.” Id. at 654, 668, 123 S.Ct. 1855; see id. at 670-71, 123 S.Ct. 1855 (Breyer, J., concurring in part); id. at 684, 123 S.Ct. 1855 (O’Con-nor, J., concurring in part and dissenting in part). And in Lawrence County, the Court considered whether a state statute regulating the manner in which certain federal funds could be distributed by local governments violated the Supremacy Clause. 469 U.S. at 257-58, 105 S.Ct. 695. It noted that a related federal case seeking a declaration that the statute “conflicted with the federal Act and was therefore invalid under the Supremacy Clause” had been dismissed by the Eighth Circuit, which concluded “that the county’s invocation of the Supremacy Clause did not convert the action into one arising under federal law.” Id. at 259 n. 6, 105 S.Ct. 695. “This ruling was erroneous,” the Court added. Id.
The majority cites Justice Kennedy’s concurrence in Virginia Office for Protection & Advocacy for the proposition that the Supremacy Clause permits only “an anticipatory action to enjoin enforcement of a state law.” (Majority Op. 830.) But the actual quote is descriptive rather than restrictive; it simply notes that the injunction sought in Ex parte Young was a preemptive assertion of a defense in equity. Va. Office for Prot. & Advocacy, 131 S.Ct. at 1642 (Kennedy, J., concurring). Justice Kennedy states immediately following the quoted sentence that “[t]he Court has expanded the Young exception far beyond its original office in order to vindicate the federal interest in assuring the supremacy of federal law.” Va. Office for Prot. & Advocacy, 131 S.Ct. at 1642 (quotation and alteration omitted). As this statement indicates, the concurrence does not suggest that defensive claims are the only ones permitted under the Supremacy Clause. To the contrary, Justice Kennedy joined the opinion of the court, which gave the green light to a suit “alleging] that respondents’ refusal to produce the requested medical records violates federal law; and seekfing] an injunction requiring the production of the records.” Id. at 1639 (majority opinion). Such a suit is clearly not one asserting a preemptive defense.
E
The majority’s deviation from Qwest Corp. also breaks with the clear weight of authority in other circuits. Numerous decisions have stressed the distinction between a cause of action under the Supremacy Clause and one seeking enforcement of the federal law in question — a distinction the majority attempts to eliminate by imposing the same requirements on Supremacy Clause claimants as those applying to plaintiffs seeking to assert an implied right of action. See Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1050, 1058 (9th Cir.2008) (holding that “a plaintiff seeking injunctive relief under the Supremacy Clause on the basis of federal preemption need not assert a- federally created ‘right,’ in the sense that term has been recently used in suits brought under § 1983, but need only satisfy traditional standing requirements”); Wright Elec., Inc. v. Minn. State Bd. of Elec., 322 F.3d 1025, 1028 (8th Cir.2003) (“[A] claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law.” (quotation omitted)); St. Thomas — St. John Hotel & Tourism Ass’n v. Virgin Islands, 218 F.3d 232, 241 (3d Cir.2000) (concluding that “a state or territori *865 al law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption” after noting that “[w]e know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption”).
As these courts recognize, the potential relief available in a Supremacy Clause claim is limited to enjoining a state or local government official from engaging in an ongoing violation of the Constitution. See Qwest Corp., 380 F.3d at 1266. A private statutory cause of action, in contrast, frequently allows for damages and in some circumstances may be asserted against private parties. See Western Air Lines, 817 F.2d at 225-26 (“an implied private right of action is a means of enforcing the substantive provisions of a federal law” and “provides remedies, frequently including damages, for violations of federal law by a government entity or by a private party”); see also Gonzaga, 536 U.S. at 277, 122 S.Ct. 2268 (damages remedy under private cause of action); Sanchez, 403 F.3d at 335 (“The Supremacy Clause claim advanced here by Appellees is not based on a claim of right under Title X, nor is it a claim for damages; it is a preemption claim. The Gonzaga Court gave no indication that it intended to alter its prior practice regarding such claims_”). Unlike a damages remedy, a suit that merely prevents a state official from violating our federal structure cannot reasonably be described as interfering with a statutory scheme. See Bond, 131 S.Ct. at 2365 (noting the role of individual claims in remedying “violation[s] of a constitutional principle that allocates power within government”); Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (“[T]he availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.”).
Further, a majority of circuits have recognized a cause of action under the Supremacy Clause to challenge allegedly preempted state laws that merely impose conditions on the receipt of government benefits and thus could not lead to an “enforcement action.” Most of these cases involve Spending Clause legislation. Yet the majority asserts that “tradition” backs its naked “assum[ption]” that Planned Parenthood is prohibited from redressing its injury through the Supremacy Clause without actually looking to the case law. (Majority Op. 826-27.)
In Sanchez, the Fifth Circuit concluded that it was “well-established” that “there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision,” 403 F.3d at 334 (quotation omitted), and reached the merits of a claim alleging that a Texas statute “imposes conditions on the receipt of federal funds that are incompatible with Title X,” id. at 335. That statute — just like the Kansas statute at issue in this case — could not have led to an “enforcement action” because it merely distributed funding. Id. at 328. Today’s panel majority creates a direct circuit split with Sanchez.
The Eighth- Circuit has also held that the Supremacy Clause provides a private right of action for claims that involve the provision of government benefits. In Lankford v. Sherman, 451 F.3d 496 (8th Cir.2006), the plaintiffs challenged a state regulation making them ineligible for durable medical equipment as inconsistent with the Medicaid Act. Id. at 501-02. The *866 court held “that plaintiffs do not have a private right of action to enforce Medicaid’s reasonable-standards provision under section 1983,” but reached the opposite conclusion with respect to the Supremacy Clause: “Preemption claims are analyzed under a different test than section 1983 claims, affording plaintiffs an alternative theory for relief when a state law conflicts with a federal statute or regulation.” Id. at 509. Lankford held that the plaintiffs were likely to prevail on their Supremacy Clause claim, id. at 513, which would require the state to provide additional benefits and thus could not possibly be a defense against an “enforcement action.” Similarly, the Third Circuit held in Lewis v. Alexander, 685 F.3d 325 (3d Cir.2012), “that the Supremacy Clause provides Plaintiffs with an independent basis for a private right of action in this case.” Id. at 345.[10] The challenged state statute defined which trusts would be counted as assets for purposes of determining Medicaid eligibility, id. at 333-34, and the challenge thus was not being used to defend against government coercion but to establish eligibility for government benefits.
In Pharmaceutical Research & Manufacturers of America v. Concannon, 249 F.3d 66 (1st Cir.2001), the plaintiff challenged a statute that directed a state agency to enter into rebate agreements with drug manufacturers. Id. at 71. Drug manufacturers were not required to enter into these agreements, and thus an “enforcement action” would be impossible. Instead, the statute provided for public identification of providers that did not participate, and required prior authorization of drugs from those companies before they could be dispensed to Medicaid beneficiaries. Id. at 71-72. The court rejected the argument that the plaintiffs interests were not adequately at issue, because the plaintiff did not assert “an action to enforce rights under the Medicaid statute, ... but rather a preemption-based challenge under the Supremacy Clause. In this type of action, it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue.” Id. at 73. The Supreme Court affirmed, although it did not discuss the Supremacy Clause private right of action issue. Walsh, 538 U.S. at 670, 123 S.Ct. 1855. The D.C. Circuit reached the same conclusion in a case essentially identical to Concannon. In Pharmaceutical Research & Manufacturers of America v. Thompson, 362 F.3d 817 (D.C.Cir.2004), the court rejected the state of Michigan’s argument that “the appellants have no private right of action for injunctive relief.” Id. at 819 n. 3 (over the separate opinions of Justices Scalia and Thomas in Walsh, 538 U.S. 644, 123 S.Ct. 1855). The Thompson court noted that by reaching the merits of the Supremacy Clause claim, “the remaining seven Justices appear to have sub silentio found no flaw” in the reasoning of the First Circuit. Id.
The Second Circuit has held, consistent with Qwest Corp., that a plaintiff may sue directly under the Supremacy Clause to seek access to government property. In Western Air Lines, the court concluded that the plaintiff lacked a cause of action under the allegedly preemptive federal statutes and affirmed the dismissal of the plaintiffs § 1983 claims for lack of prose *867 cution. 817 F.2d at 224-25. Highlighting the “distinction between a Supremacy Clause claim and other private rights of action,” the court held that the plaintiff could sue directly under the Supremacy Clause to challenge an airport’s perimeter rule that refused flights from a certain distance. Id. at 226. The court in Western Air Lines expressly noted that this rule was not a coercive restriction but part of the “proprietary powers of airport operators.” Id. Thus the allegedly preempted rule was not one that could lead to an “enforcement action” but simply imposed a condition on the use of property held by a local government body.
And our circuit, in Qwest Corp. and Edmondson, has recognized a direct cause of action under the Supremacy Clause to challenge local enactments that could not be enforced in a coercive action. That makes no fewer than seven circuits that have rejected the rationale espoused by the majority.
F
In some future case, the Supreme Court might upend the long line of cases flowing from Ex parte Young to Shaw to Qwest Corp., reject the view of a majority of circuits, and curtail litigants’ ability to assert the supremacy of federal law in protecting their rights. In the Supreme Court, “stare decisis is a principle of policy rather than an inexorable command.” Hohn v. United States, 524 U.S. 236, 251, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (quotations omitted). Not so in this court. Meyers, 200 F.3d at 720.
In Douglas, the Court explicitly stated: “[W]e do not address whether the Ninth Circuit properly recognized a Supremacy Clause action to enforce this federal statute before the agency took final action.” 132 S.Ct. at 1211. Notwithstanding the position of the Chief Justice’s dissent on the matter, the only fair interpretation of Douglas is that the inquiry remains open at that level. Since Douglas, the Fourth Circuit has explicitly declined to reassess its existing precedent. See United States v. South Carolina, 720 F.3d 518, 525-26 (4th Cir.2013) (“Nothing in the Chief Justice’s dissent disturbed the prior holdings of the Supreme Court or circuit courts that have allowed private parties to seek in-junctive relief from state statutes allegedly preempted by federal law.”).
My colleagues claim that Planned Parenthood of Indiana supports their decision to upend our circuit precedent based on the Douglas dissent because the Seventh Circuit was “not inclined to agree” with the position of multiple circuits, including our own, that allow a cause of action directly under the Supremacy Clause. (Majority Op. 828 (quoting 699 F.3d at 983).) But the Seventh Circuit’s discussion of the Douglas dissent did not reject binding circuit precedent, and that panel did what my colleagues categorically refuse to do: proceed to the merits of Planned Parenthood’s claims. Planned Parenthood of Ind., 699 F.3d at 983-85. Looking for whatever they can find that might support the adoption of a dissenting opinion, my colleagues meekly point to a state court decision from Massachusetts. Boston Med. Ctr. Corp. v. Sec’y of the Exec. Office of Health & Human Servs., 463 Mass. 447, 974 N.E.2d 1114, 1127-28 (2012). I acknowledge that state opinions may provide persuasive analysis in some instances, but the cited decision contains no substantive discussion of the Supremacy Clause issue, and “the federal courts are particularly appropriate bodies for the application of pre-emption principles.” Hagans v. Lavine, 415 U.S. 528, 550, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (quotation omitted). The majority’s invocation of the Douglas dissent as a *868 basis for denying Planned Parenthood a cause of action is unwarranted.
Ill
The district court opinion before us on review for error is well-grounded in its findings of fact and based on a learned presentation of the appropriate authorities. Because it correctly applies the precedents of the Court and of this court, it is free of error and justly worthy of affirmance. I am neither persuaded to follow the vanishing trail that my colleagues pursue in an end run around the district court, nor am I amenable to their harsh treatment of binding precedent. Accordingly, I dissent.

. The funding cuts also applied to the Dodge City Family Planning Clinic, which was previously an intervenor in this case. Because the organization ceased operations and is no longer seeking funding from the Kansas Department of Health and Environment ("KDHE”), we dismissed Dodge City’s appeal as moot upon a joint stipulation of the parties.

. Because I would affirm the district court’s conclusion as to Planned Parenthood's Supremacy Clause claim, I would not reach its First Amendment claim. Nonetheless, I must voice my disagreement with the majority's analysis of that issue. The majority argues that Planned Parenthood's claim does not fall within an asserted category of cases, "those in which a person is penalized by discretionary executive action for prior speech or association.” (Majority Op. 839.) In doing so, the majority ignores the undisputed evidence of executive action noted above: KDHE pulled funding from Planned Parenthood without having contracted with alternative providers.
The majority bases its holding entirely on the putative absence of executive action and the inability of courts to overturn legislative enactments due to improper motives. It therefore does not reach plaintiff's argument that Section 107(1) is unconstitutional because it disqualifies Planned Parenthood from receiving government funds on the basis of its constitutionally protected activity. KDHE has in practice barred Planned Parenthood from Title X funding based on its affiliation with abortion. As the Supreme Court recently held, legislatures may "define the limits of [a] government spending program” but may not "leverage funding to regulate speech outside the contours of the program itself.” *849 Agency for Int'l Dev. v. Alliance for Open Soc’y Int’l, Inc., - U.S. -, 133 S.Ct. 2321, 2328, 186 L.Ed.2d 398 (2013).

. As the majority observes, courts must occasionally decide antecedent issues that the parties may not have briefed in order to resolve the dispute between the litigants. (Majority Op. 837); see also U.S. Nat’l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 447, *851 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). Because the lack of a cause of action is an affirmative defense, the plaintiff is not required to negate this defense unless properly preserved, and thus the issue is not antecedent in the appropriate sense. See Lake Country Estates, Inc., 440 U.S. at 398, 99 S.Ct. 1171.

. If this is the basis of the majority’s hypothetical enforcement action, it must be presumed that Planned Parenthood could similarly attempt to "continuef ] to provide [family planning] service as it had in the past,” (Majority Op. 835 n. 5), by stealing state funds to replace its prior Title X funding. But as far as I can tell, the subsequent criminal proceeding would qualify as an "enforcement action” under the majority’s reasoning. I would hope that important rules of constitutional law are not based on such fanciful hypotheticals, but I must highlight the exact congruence between the plaintiffs in this case and Qwest Corp.

. Because the majority places great weight on the use of the phrase “enforcement action” in the district court order enjoining parts of the ordinance at issue in Qwest Corp., I note that the district court on review in Edmondson did not use the word "enforcement action” to describe its injunction. Instead, much like the district court order on review before us, it simply used a form of the verb "enforce”: "Because of ... the irreparable harm Plaintiffs will suffer if an unconstitutional Act is enforced, the Court finds Plaintiffs' Motion for Preliminary Injunction ... should be and is GRANTED.” Chamber of Commerce of the U.S. v. Henry, No. CIV-08-109-C, 2008 WL 2329164, at *8 (W.D.Okla. June 4, 2008) (unpublished).

. The majority repeatedly chastises both Planned Parenthood and this dissent for citing cases that deal with § 1983, private statutory rights of action, the Eleventh Amendment, and jurisdictional issues. (Majority Op. 831-33.) My colleagues refuse to follow our Supremacy Clause jurisprudence from Qwest Corp. and Edmondson, and they summarily reject in a single footnote the well-reasoned decisions on point from a majority of other circuits, (Majority Op. 836 n. 7), electing instead to spin from whole cloth a new test never endorsed by another court. I am therefore forced to look to analogous precedent for “general expressions” of the law. (Majority Op. 835-36 (citing Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821)).) Moreover, because the majority's test imports techniques of statutory interpretation that courts have previously used to determine whether a statute itself or § 1983 provides a private right of action, it is entirely appropriate to rely on such cases in assessing my colleagues’ reasoning.

. My colleagues say that the possibility of APA relief in Qwest Corp. "was never addressed by the court and parties,” (Majority Op. 835 n. 6), suggesting that the panel's silence on the matter supports their position. But the absence of any discussion of an APA remedy is precisely the point. The majority’s assertion that the possible availability of APA review in this case distinguishes it from Qwest Corp. is an invention; APA review is equally available to the plaintiffs in both cases. And as I have already noted, the APA was not properly addressed by the parties in this case. The majority raised the issue sua sponte in its call for supplemental briefing.

. Similarly, a federal right may be unenforceable under § 1983 if the statute creates a “comprehensive enforcement scheme.” City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (quotation omitted). However, an agency’s “power to shut off all or part of a state's funding is not a comprehensive enforcement scheme.” Planned Parenthood of Ind., Inc. v. Comm’r of Ind. State Dept. of Health, 699 F.3d 962, 974-75 (7th Cir.2012) (quotation omitted). As the Supreme Court has explained, agency authority over funding, even when coupled with the "availability of an action against [an agency] under the APA,” does not provide a “sufficiently comprehensive" scheme to bar other avenues of relief. Wilder v. Va. Hosp. Ass’n, 496 U.S. 498, 522 & n. 19, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Thus, "[c]ourts have consistently held that statutory schemes that merely give oversight and funding control to the federal government do not foreclose § 1983 claims.” Joseph A. v. Ingram, 275 F.3d 1253, 1263 (10th Cir.2002).

. Qwest Corp. was a cross-appeal. 380 F.3d at 1262.

. Although the plaintiffs also filed suit under § 1983, the district court concluded that it was necessary to reach the Supremacy Clause issue because plaintiffs challenged one of the statutory provisions solely in their Supremacy Clause claim. Lewis, 685 F.3d at 345 n. 17. Noting that this “may be an overly narrow construction of the Complaint,” the Third Circuit nevertheless concluded that "the Supremacy Clause does provide a cause of action” and affirmed. Id.